UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DON A. BESKRONE,

                                        Plaintiff,

                    -v-

KENNETH A. BERLIN *et al.*,

                                        Defendants.

21 Civ. 4803 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves claims against corporate executives for breach of fiduciary duty, fraud, gross negligence, and negligent misrepresentation.  Kenneth A. Berlin ("Berlin"), Ron Kalfus ("Kalfus"), and Brian Markison ("Markison") (together, "defendants"), are, respectively, the former chief executive officer ("CEO"), chief financial officer ("CFO"), and chairman of the board of directors of a biotechnology company, Rosetta Genomics, Ltd. ("Rosetta Ltd.").  In these roles—as well as in leadership roles for a subsidiary, Rosetta Genomics, Inc. ("Rosetta Inc.") (together with Rosetta Ltd., "Rosetta")— defendants are alleged to have overseen a scheme to bill Medicare falsely for reimbursements relating to a medical test produced by Rosetta Inc.  When Medicare caught on to the fraud, defendants allegedly then failed to disclose the situation to investors, creditors, lenders, and regulators, while raising millions of dollars in new equity investments and debt financing, and planning an (ultimately failed) merger.  Eventually, Rosetta Ltd. and Rosetta Inc. had to file for bankruptcy, allegedly traceable to defendants' malfeasance.

The plaintiff here, Don A. Beskrone ("Beskrone"), brings claims on behalf of multiple entities: (1) on behalf of the estate of Rosetta Inc., claims against Berlin and Kalfus for breach of

fiduciary duty and gross negligence; (2) on behalf of the estate of Rosetta Ltd., claims against all defendants for breach of fiduciary duty, gross negligence, and negligent misrepresentation; (3) on behalf of both estates, claims against all defendants for fraud in connection with the failed merger; and (4) as assignee of the claims by two investment funds, Sabby Healthcare Master Fund, Ltd. and Sabby Volatility Warrant Master Fund, Ltd. (together, "Sabby"), claims against Berlin and Kalfus for breach of fiduciary duty and gross negligence in connection with the transactions with Sabby.

At the threshold, however, is a matter of personal jurisdiction. Defendants have moved to dismiss, predominantly for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6), but also for want of personal jurisdiction, under Rule 12(b)(2). For the reasons that follow, the Court grants that motion on Rule 12(b)(2) grounds, finding that it lacks personal jurisdiction over defendants for the claims brought here.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

Beskrone is a citizen of Delaware. He brings claims in three capacities. SAC ¶ 17.

First are claims as Rosetta Inc.'s trustee. *Id.* ¶¶ 23, 25. His appointment as trustee vested him with the rights to "prosecute and settle, subject to Bankruptcy Court approval, all claims and

---

[1] This factual account draws from the Second Amended Complaint, Dkt. 60 ("SAC"), and the exhibits cognizable to it. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

causes of action of . . . [Rosetta Inc.]," *id.* ¶ 26.  Rosetta Inc. is a Delaware corporation and has

its principal place of business in Pennsylvania.  *Id.* ¶ 17.  As a result of its bankruptcy, Rosetta

Inc. has ceased operations and no longer has employees.  *Id.* ¶ 34.

Second are claims as Rosetta Ltd.'s trustee.  *Id.* ¶¶ 36–39.  Rosetta Ltd. developed and

commercialized diagnostic tests based on genomic markers.  *Id.* ¶ 40.  Rosetta Ltd. is an Israeli

limited company, *id.* ¶ 27, and the parent company of Rosetta Inc., which it owns wholly.  *See id.*

¶¶ 3, 27.  In February 2022, Beskrone took assignment of Rosetta Ltd.'s "direct claims against its

former officers and directors."  *Id.* ¶ 36; *see id.* ¶¶ 37–39.

Third are claims on behalf of Sabby, a pair of investment funds organized in the Cayman

Islands.  *Id.* ¶¶ 3, 21.  As alleged, Sabby invested in Rosetta Ltd.  *Id.* ¶ 3.  In May 2021,

Beskrone took assignment of "any and all claims against Rosetta Ltd[.]'s and [Rosetta Inc.'s]

officers, directors, employees and third parties."  *Id.* ¶ 35.

Defendants are three individuals formerly employed by Rosetta Ltd. and/or Rosetta Inc.

*See id.* ¶¶ 18–20.

Berlin was CEO and president of Rosetta Ltd. from November 2, 2009, until April 18,

2018.  *Id.* ¶ 18.  He was also Rosetta Inc.'s sole director.  *Id.*  Berlin is a citizen of New Jersey,

according to the SAC, or California, according to Berlin.[2]  *Id.*

Kalfus was CFO of Rosetta Ltd. and Rosetta Inc. "at all times relevant to this

proceeding."  *Id.* ¶ 19.  He is a citizen of New Jersey.  *Id.*

---

[2] The SAC alleges that Berlin is a citizen of New Jersey.  SAC ¶ 18.  Defense counsel, in a letter
to the Court, represented that Berlin is a citizen of California.  *See* Dkt. 83 at 3 n.7.  The analysis
in this decision does not differ depending on which is correct.  There is no claim that Berlin is a
citizen of New York.

Markison was chairman of Rosetta Ltd.'s board "at all times relevant to this proceeding." *Id.* ¶ 20.  He is a citizen of New Jersey.  *Id.*

### 2.    The SAC's Allegations Involving Fraudulent Revenue

Rosetta Inc.'s "primary intellectual property and source of revenue" was a medical test called RosettaGX Reveal MicroRNA Thyroid test ("Reveal").  *Id.* ¶ 4.  In 2017, the Reveal test accounted for 75–85% of Rosetta Inc.'s revenues.  *Id.* ¶ 41.

The SAC alleges that, from "[d]ay [o]ne," Rosetta's reimbursement claims as submitted both to Medicare and to commercial insurers falsely coded Reveal as "Cancer Origin," an unrelated test designed to identify a tumor's organ of origin.  *Id.*  Rosetta did so, the SAC alleges, because the reimbursement claims for the Cancer Origin test were reliably reimbursed by Medicare and commercial carriers, *id.* ¶ 42, in part because Cancer Origin had a Local Coverage Determination ("LCD"), *id.* ¶ 41.  Reveal, in contrast, was not covered by an LCD, and reimbursement requests, when coded as such, were rarely fulfilled.  *Id.* ¶ 42.

As a result of Rosetta's false coding, the SAC alleges, it was drastically overpaid for Reveal claims, particularly by Medicare.  *Id.*  Medicare took at face value Rosetta's claims for reimbursement that characterized Reveal tests as Cancer Origin tests, and reimbursed such claims, prior to mid-2017, in more than 90% of cases.  *Id.*  After the company's practice of false coding was discovered, the Medicare reimbursement rate plummeted, and was less than 5% by February 2018.  *Id.*

Rosetta's internal documents, including communications from Berlin to Rosetta's general counsel, establish that Rosetta's practice of falsely coding Reveal tests as Cancer Origin tests began "from [d]ay [o]ne" and, the SAC alleges, defendants knew or should have known was false "from [d]ay [o]ne."  *Id.*  The SAC alleges defendants had actual knowledge of Rosetta's false coding practices no later than mid-June 2017.  *Id.*  And because the vast majority of

Rosetta's 2016 and 2017 revenue consisted of insurance reimbursements—which, in turn overwhelmingly consisted of Reveal revenue—defendants "knew or should have known that financial statements and other disclosures of revenue were inflated, subject to significant risk, and subject to overpayment claims." *Id.* ¶ 43.

In June 2017, the SAC alleges, defendants learned that the false coding of Reveal was the subject of regulatory scrutiny. *Id.* ¶ 6. In response, they launched what they termed an "internal investigation" into Rosetta's billing practices and purported to "fix" the coding. *Id.* To the extent defendants ceased falsely coding Reveal as Cancer Origin, the SAC alleges, there was an "obvious, immediate[,] and severe" impact on reimbursement rates and revenues. *Id.* But, notwithstanding awareness of this wrongdoing, the SAC alleges, defendants continued to falsely code at least one Reveal test as Cancer Origin months after the purported June 2017 "fix." *Id.* Medicare service providers by this time were subjecting Rosetta's claims to "significantly greater scrutiny," and denied the Cancer Origin claim as false. *Id.* Despite knowing and internally acknowledging that Reveal should not be coded Cancer Origin, defendants repeatedly appealed Medicaid's denial of reimbursement. *Id.* On January 22, 2018, Medicare, through its contractor, again rejected a Reveal claim, this one for a test performed on December 21, 2017 that had been coded falsely as "Cancer Origin." *Id.* ¶ 78. Rosetta again appealed the decision. *Id.* On February 7, 2018, Medicare denied Rosetta's appeal. *Id.*

### 3.    SEC Disclosures

The SAC alleges three examples of materially false and misleading disclosures in materials Rosetta filed with the SEC relating to Reveal.

First is Rosetta Ltd.'s September 26, 2016 Form 6-K. It was signed by Kalfus, and submitted along with Rosetta Ltd.'s June 30, 2016 unaudited financial statements. *Id.* ¶ 44. Rosetta Ltd. reported revenues and "gross billings" on Reveal, which were the focus of Rosetta

Ltd.'s accompanying press release, also filed with the SEC. *Id.* In the 6-K and press release, the SAC alleges, Rosetta Ltd. failed to disclose that it was falsely coding Reveal claims as "Cancer Origin" and that this had produced the favorable reimbursement rates. *Id.*

Second is Rosetta Ltd.'s March 30, 2017 20-F for 2016, which contained the same "material[] misrepresent[ions of] its revenues and liabilities and failed to disclose the false coding of Reveal and its material impact on Rosetta Ltd[.]'s assets, revenue, liabilities, operations, and solvency." *Id.* ¶ 60.

Third is Rosetta Ltd.'s October 10, 2017 Form 6-K, which significantly overstated the long-term revenue prospects, given the recent revelations relating to the company's fraudulently generated reimbursement rates. *Id.* ¶ 72. Rosetta Ltd. there also falsely stated that it "intend[ed] to update its Reveal revenue and unit guidance by year-end 2017"; it never did so. *Id.* ¶ 73.

### 4. The 2016 and 2017 Sabby Transactions

The SAC alleges that in 2016 and 2017, defendants induced Sabby to invest millions of dollars in Rosetta Ltd., through a series of securities purchase agreements ("SPAs") and the purchase of stock. *Id.* ¶ 3. Defendants did so "despite knowledge (or reason to know) of material facts about its flagship product" Reveal—namely, that Reveal lacked an LCD and was being falsely coded for reimbursement, facts which defendants "misrepresented or omitted and failed to disclose" to Sabby prior to the investments and stock purchases. *Id.* ¶ 1.

#### a. The 2016 SPA

The SAC alleges that on or about November 23, 2016, Rosetta Ltd. entered into an SPA with Sabby (the "2016 SPA"), in which Sabby agreed to purchase from Rosetta Ltd. 1,095,000 ordinary shares, along with warrants to purchase up to 10 million ordinary shares at a set initial exercise price, in exchange for paying $3,160,000 to Rosetta Ltd. *Id.* ¶ 4. The SAC alleges that

Berlin executed the agreement on behalf of Rosetta Ltd., *id.* ¶ 46; a signature line appears with his name on the 2016 SPA filed with the Court, although the copy filed is unsigned, *see* Dkt. 78-1 (unsigned copy of 2016 SPA). Several provisions of the 2016 SPA concerned Rosetta Ltd.'s financial health and its affirmative duty to disclose information material to the transaction. *See* SAC ¶¶ 54–57. The SAC alleges that these representations and warranties regarding Rosetta Ltd.'s accounting and controls, solvency, and regulatory compliance were materially false and misleading. *Id.* ¶ 58. Under the agreement, the 2016 SPA, including more than $3 million in debentures, was expressly guaranteed by Rosetta Inc. and Rosetta Ltd.'s other subsidiaries. *Id.* ¶ 57. None of these subsidiaries, however, disclosed Rosetta's fraudulent practices with respect to Reveal. *Id.* ¶ 58.

Pertinent to the instant motion, the SAC describes the 2016 SPA as containing "New York choice of law and New York choice of forum provisions inclusive of Rosetta's affiliates, directors, officers, shareholders, partners, members, employees and agents," under which "Rosetta Ltd[.] and its subsidiaries irrevocably submitted to the exclusive jurisdiction of the state and federal courts of the State of New York and waived personal service of process." *Id.* ¶ 59.

### b. The 2017 SPAs

In 2017, Rosetta Ltd. entered into two more SPAs with Sabby. First, on August 3, 2017, these parties entered into a new SPA (the "August 3, 2017 SPA"), under which Sabby agreed to purchase several amounts of stock in different stock classes in exchange for $2,711,844. *Id.* ¶ 64. On September 28, 2017, the parties entered into a third SPA (the "September 28, 2017 SPA"), under which Sabby agreed to purchase more debentures and warrants for $2 million. *Id.* ¶ 66. The SAC alleges that the August 3, 2017 SPA and the September 28, 2017 SPA were both executed by Berlin, who failed to disclose the discovery of the bogus Reveal reimbursements and

the consequent declines in reimbursement rates and revenue. *Id.* ¶¶ 65, 67; *see also* Dkts. 78-3 (signed copy of August 3, 2017 SPA); 78-4 (unsigned copy of September 28, 2017 SPA).

The second and third SPAs contained "materially identical" "terms, choice of law and forum, warranties and representations" as the 2016 SPA. SAC ¶ 68. Of these, the September 28, 2017 SPA—but not the August 3, 2017 SPA—was guaranteed by Rosetta Ltd.'s subsidiaries. *Id.* ¶ 69.

### 5.      The Genoptix Merger and 2018 Sabby Transaction

Defendants also, according to the SAC, made similar false and misleading disclosures relating to Reveal in connection with Rosetta's failed merger with Genoptix, Inc. ("Genoptix").[3] *See id.* ¶¶ 77–107. Specifically, at no time during merger discussions or after the parties had consummated several agreements in anticipation of such a merger did defendants disclose "any adverse issues concerning the Reveal tests, the internal 'investigation,' the decline in Medicare reimbursements, the decline in revenue," or the various misleading SEC filings. *Id.* ¶ 77. Undisclosed, the SAC alleges, was the fact that "[f]or at least two years prior to [the final merger agreement] and thereafter, [Rosetta Inc.] was insolvent." *Id.* ¶ 89.

On December 14, 2017, Genoptix entered into an agreement to acquire Rosetta Ltd., including its wholly owned subsidiary, Rosetta Inc. *Id.* On February 22, 2018, however, the "proposed merger did not obtain sufficient positive votes required for approval" from Rosetta Ltd.'s shareholders. *Id.* ¶ 79. On February 27, 2018, Genoptix entered into another agreement with Rosetta Ltd. (the "New Agreement and Plan of Merger"), which is "believed to have" the same material terms, save for a different "purchase price and closing date." *Id.* ¶ 80. The SAC

---

[3] The SAC is silent as to the nature of Genoptix's business activities.

alleges that Markison and Berlin approved the merger transaction and the two related agreements, *id.* ¶¶ 81–82, and that Berlin "executed" the agreements, *id.* ¶ 82.

On February 27, 2018, Genoptix and Rosetta Inc. entered into an SPA, which Berlin executed for Rosetta Inc. *Id.* ¶ 83. Under it, Rosetta Inc. agreed to sell its indirect subsidiary Minuet Diagnostics, Inc. (and Minuet Diagnostics's subsidiary, CynoGen, Inc.) to Genoptix. *Id.* Minuet Diagnostics, Inc. was wholly owned by Rosetta Inc. *Id.* This agreement was not contingent on the merger's closing. *Id.* The SAC alleges that the terms of this merger in the SPA departed from customary ones and harmed Rosetta Ltd., Rosetta Inc., and their creditors. *Id.*

On December 14, 2017, Genoptix and Rosetta Inc. entered into (and, on February 27, 2018, amended) a loan and security agreement (the "Loan and Security Agreement"), which was executed by Berlin. *Id.* ¶ 84. Under it, Genoptix agreed to extend Rosetta Inc. a bridge loan of up to $600,000 monthly, bearing simple interest of 10% per annum. *Id.* The bridge loan was secured by, among other things, the capital stock of Rosetta Inc. and its subsidiaries. *Id.* The SAC alleges that this agreement, too, was not contingent on the closing of the merger, and contained non-customary terms. *Id.* The Senior Secured Note attached as Exhibit A to the Loan and Security Agreement, and incorporated therein by reference, provided, *inter alia*, that disputes relating to it would be adjudicated in New York under New York law. *Id.*

The SAC alleges that defendants "acted in bad faith and had a self-interest in approving and causing Rosetta Ltd. to enter into these agreements in order to induce Genoptix" to purchase Rosetta Ltd. because they held shares in Rosetta Ltd. that would become "worthless" were the merger not consummated. *Id.* ¶ 85. And, it alleges, defendants violated provisions of the New

Agreement and Plan of Merger requiring certifications, representations, and warranties as to Rosetta Ltd.'s and Rosetta Inc.'s overall good health as corporate entities. *See id.* ¶¶ 96–104.

"Following its failure to gain approval of the proposed merger," Rosetta Ltd., through Berlin, "solicited Sabby to purchase additional shares of Rosetta Ltd. in the open market." *Id.* ¶ 86. Sabby agreed to purchase additional shares of Rosetta Ltd. at a total purchase price of $367,735. *Id.* The SAC alleges that Berlin, in connection with this transaction, never disclosed to Sabby any of the ongoing issues with Reveal. *Id.*

On March 11, 2018, and April 17, 2018, the New Agreement and Plan of Merger was amended. *Id.* ¶ 88. The March 11, 2018 amendment was executed by Berlin; the April 17, 2018 amendment was executed by Kalfus. *Id.* These amendments did not materially change the provisions of the New Agreement and Plan of Merger. *Id.* Both the March 11, 2018, and April 17, 2018 amendments contained the same New York choice of law provision. *Id.*

On April 26, 2018, Rosetta Ltd. held a shareholders' meeting for the purpose of obtaining approval of the proposed merger with Genoptix. *Id.* ¶ 89. The SAC alleges that with Sabby's additional purchase of shares, the proposed merger "obtained sufficient positive votes and was approved." *Id.* However, it alleges, in late May 2018, after conducting due diligence, Genoptix exercised its rights under the New Agreement and Plan of Merger, as amended, and withdrew from the merger. *Id.* ¶ 93. "This was followed by Rosetta Ltd. and [Rosetta Inc.] filing for Chapter 7 Bankruptcy liquidation." *Id.* ¶ 107.

### B.    Procedural History

On May 28, 2021, Beskrone initiated this action. Dkt. 1 (the "Complaint"). On October

7, 2021, after defendants failed to answer or otherwise respond to the Complaint, the Court

ordered Beskrone to show cause for his failure to serve. Dkt. 19. On October 20, 2021,

Beskrone explained that there were ongoing negotiations with defendants regarding service.

Dkts. 19–20. On October 22, 2021, Beskrone notified the Court that he intended to drop all

claims as to some defendants, Dkt. 27; the Court thereafter dismissed those defendants, Dkt. 28,

leaving only the present three defendants (Berlin, Kalfus, and Markison).

On December 2, 2021, defendants moved to dismiss the Complaint. Dkts. 34–36. On

December 23, 2021, Beskrone amended the complaint. Dkt. 37 (the "AC"). On January 13,

2022, defendants moved to dismiss the AC. Dkts. 40–42. On February 9, 2022, Beskrone

sought leave to file a second amended complaint. Dkts. 51–53. On February 11, 2022,

defendants opposed that motion. Dkts. 55–56. On February 23, 2022, the Court granted

Beskrone's motion to amend. Dkt. 57.

On March 16, 2022, Beskrone filed the SAC. Dkt. 60. On April 18, 2022, defendants

moved to dismiss the SAC. Dkts. 70–72. The motion to dismiss predominantly argued that the

SAC did not a state a claim, but it also argued that personal jurisdiction was lacking, and that the

case should be dismissed based on the doctrine of *forum non conveniens*. *See* Dkt. 70. On April

19, 2022, Beskrone filed his opposition. Dkts. 73–74. On May 10, 2022, the Court held a

conference. *See* Dkt. 65; *see also* Dkt. 77 (case management plan). At it, the Court requested

additional documents from Beskrone, bearing on the aspect of the motion challenging personal

jurisdiction. On May 12, 2022, Beskrone submitted additional materials. Dkt. 78. On July 13,

2022, the Court solicited supplemental briefing on discrete issues pertaining to the motions to

dismiss for want of personal jurisdiction and *forum non conveniens*. Dkt. 79. On July 21, 2022,

Beskrone filed his letter-response. Dkt. 82. On July 28, 2022, defendants filed theirs. Dkt. 83.

## II.    The Motion to Dismiss for Lack of Personal Jurisdiction

Defendants' motion to dismiss leads with numerous arguments under Rule 12(b)(6). The

Court's analysis, however, properly begins with defendants' challenge to personal jurisdiction

under Rule 12(b)(2). *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)

("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature

and limits of the judicial power of the United States' and is 'inflexible and without exception.'"

(quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884))).

### A.    Applicable Legal Standards

Two requirements for a federal court to exercise personal jurisdiction are relevant here.[4]

First, "there must be a statutory basis for personal jurisdiction that renders such service of

process effective." *Licci*, 673 F.3d at 59. Second, "an exercise of jurisdiction under these laws

[must be] consistent with federal due process requirements." *Grand River Enters. Six Nations,*

*Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).

As to the former, a court must have a statutory basis for asserting personal jurisdiction

over each defendant, based on the long-arm statute of the state in which it sits. *See* 31 U.S.C.

§ 3732(a); *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015). New York's long-

arm statute provides for general jurisdiction, *see* New York Civil Practice Law and Rules

("C.P.L.R.") § 301, which may arise from a foreign defendant's overall course of business in the

state. Such jurisdiction is proper when "a company has engaged in such a continuous and

---

[4] A plaintiff's "service of process upon the defendant" must also "have been procedurally
proper." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).
Proper service is not challenged here.

12

systematic course of doing business in New York that a finding of its presence in New York is warranted." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (cleaned up). It also provides for specific jurisdiction, *see* C.P.L.R. § 302(a)(1), which may arise depending on the foreign defendant's contacts with the state in connection with the cause of action.

As to the latter, once a *prima facie* showing of a statutory basis for jurisdiction has been made, the plaintiff must "demonstrate that the exercise of jurisdiction comports with due process." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81–82 (2d Cir. 2018); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The constitutional analysis under the Due Process Clause consists of two separate components: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Licci*, 673 F.3d at 60 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)).

The minimum-contacts inquiry examines "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.* The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" such that the defendant "should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)). In conducting the minimum-contacts inquiry, the Court "recogniz[es] two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). General jurisdiction exists when a defendant is "essentially at home" in the forum state.

13

*Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011).  In "the

'paradigm' case, an individual is subject to general jurisdiction in her place of domicile . . . .

And the 'equivalent' forums for a corporation are its place of incorporation and principal place

of business." *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Daimler AG v. Bauman*, 571 U.S.

117, 119 (2014)).  Specific jurisdiction exists only if there is "some act by which the defendant

purposefully avails itself of the privilege of conducting activities within the forum State."

*Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  For specific jurisdiction to exist, "there must be

an affiliation between the forum and the underlying controversy, principally, an activity or an

occurrence that takes place in the forum State and is therefore subject to the State's regulation."

*Ford Motor Co.*, 141 S. Ct. at 1025 (cleaned up); *see also Walden v. Fiore*, 571 U.S. 277, 285

(2014).

    The "reasonableness" inquiry examines "whether the assertion of personal jurisdiction

comports with 'traditional notions of fair play and substantial justice'—that is, whether it is

reasonable to exercise personal jurisdiction under the circumstances of the particular case."

*Licci*, 673 F.3d at 60 (quoting *Int'l Shoe*, 326 U.S. at 216).  The Court considers:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the
> interests of the forum state in adjudicating the case; (3) the plaintiff's interest in
> obtaining convenient and effective relief; (4) the interstate judicial system's interest
> in obtaining the most efficient resolution of the controversy; and (5) the shared
> interest of the states in furthering substantive social policies.

*Chloe*, 616 F.3d at 164–65 (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 113–

14 (1987)).[5]

---

[5] As the above discussion reflects, the due process inquiry significantly overlaps with that under
§ 302(a)(1).  Salient here, § 302(a)(1) is more demanding—it permits personal jurisdiction under
narrower conditions—than the Due Process Clause.  Because "the Due Process Clause permits
the exercise of jurisdiction in a broader range of circumstances [than] N.Y. C.P.L.R. § 302, . . . a
foreign defendant meeting the standards of § 302 will satisfy the due process standard." *Energy*

On a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quotation omitted). Where, as here, jurisdictional discovery has not been conducted, the plaintiff, to defeat a motion to dismiss, need only put forth "legally sufficient allegations of jurisdiction." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).

## III.    Discussion

Defendants are non-residents of New York. Noting that the SAC does not contain any concrete factual allegations as to their business dealings or presence in New York, they argue that plaintiff has not established either statutory personal jurisdiction under the New York C.P.L.R. or minimum contacts sufficient to establish either specific or general personal jurisdiction and thereby to satisfy due process. Defs. Mem. at 43–44; *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673–74 (2d Cir. 2013). The Court first considers general and then specific jurisdiction.

---

*Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008). And if the Due Process Clause does not permit the exercise of jurisdiction, neither will C.P.L.R. § 302. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements.").

### A.     General Jurisdiction

C.P.L.R. § 301 "allows courts in New York to exercise general personal jurisdiction over individuals who are 'domiciled in New York, have a physical presence in New York, . . . consent to New York's exercise of jurisdiction, [or,] . . . "do[] business" in [New York].'" *Delgado-Perez v. City of New York*, No. 17 Civ. 01194 (LTS), 2018 WL 6200039, at *2 (S.D.N.Y. Nov. 28, 2018) (quoting *Pinto-Thomaz v. Cusi*, No. 15 Civ. 1993 (PKC), 2015 WL 7571833, at *3 (S.D.N.Y. Nov. 24, 2015)).  Each defendant, however, is a citizen of New Jersey or California. The SAC does not contain any allegation that any defendant is domiciled in New York, has or has had any physical presence in New York, or owns any real or personal property in the state.

For a New York court to exercise general jurisdiction over a nonresident defendant, that defendant must be "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981) (quoting *Simonson v. Int'l Bank*, 14 N.Y.2d 281, 285 (1964)); *see also TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 581 (S.D.N.Y. 2012) ("Under CPLR § 301, general jurisdiction, which arises out of a defendant's contacts with the forum even if the contacts are unrelated to the action before the court, is established over a foreign corporation or individual engaging in a continuous and systematic course of doing business in New York." (citation omitted)).  "Although the 'doing business' test is most often used to find jurisdiction over a corporate defendant, this test can be applied to a nonresident individual." *Rosado v. Bondi*, No. 16 Civ. 6916 (NSR), 2017 WL 4947122, at *3 (S.D.N.Y. Oct. 27, 2017) (quoting *Patel v. Patel*, 497 F. Supp. 2d 419, 425 (E.D.N.Y. 2007)).  In such cases, the individual defendant still "must be 'engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction.'" *Patel*, 497 F. Supp. 2d at 425 (quoting *J.L.B.*

*Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 547–48 (S.D.N.Y. 2001)). New York courts have interpreted § 301 to require that the defendant "be present in New York not occasionally or casually, but with a fair measure of permanence and continuity"; factors examined include indicia of a physical presence in the state, such as the existence of an office, bank accounts, or other property in the state. *Id.* (cleaned up).

    Beskrone falls far short of meeting that standard. And, indeed, his SAC does not explicitly allege that the Court has general jurisdiction over any defendant. It does so only impliedly, in a single one-sentence allegation, which broadly states that "[t]he Court has personal jurisdiction over Defendants, each of whom transacted business in this District, [and] has significant personal contacts with this District." SAC ¶ 15. But the SAC does not contain any concrete allegations about any "transact[ions of] business" by defendants in New York—or even allegations about plaintiff's transactions in New York. Nor does it contain any factual allegations about defendants' personal contacts in New York. Devoid of particulars, the SAC's generalized claims about business transactions must be set aside. The burden is plaintiff's to establish jurisdiction, and "allegations or evidence of activity constituting the basis of jurisdiction must be non-conclusory and fact-specific." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 290 (S.D.N.Y. 2019); *see Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (noting need for "factual specificity necessary to confer jurisdiction").

    Even had the Court taken as true the SAC's general claim to the effect that defendants had New York business activities, that allegation would have been insufficient to establish general personal jurisdiction over them. That is because defendants here are sued in their capacities as individual persons, not as corporate representatives, and "New York courts have concluded that [because] CPLR 301 applies to persons acting only in their individual

capacities, . . . their activities on behalf of an employer or corporation will not support the exercise of personal jurisdiction." *Pinto-Thomaz*, 2015 WL 7571833, at *5 (emphasis added); *see also Laufer v. Ostrow*, 55 N.Y.2d 305, 313 (1982) (defendant "does not subject himself, individually, to the CPLR 301 jurisdiction of our courts, however, unless he is doing business in our State individually"); *Wallace Church & Co. v. Wyattzier, LLC*, No. 20 Civ. 1914 (CM), 2020 WL 4369850, at *5 (S.D.N.Y. July 30, 2020) ("An individual defendant 'cannot be subject to jurisdiction under CPLR § 301 unless he is doing business in New York as an individual rather than on behalf of a corporation.'" (quoting *Brinkmann v. Adrian Carriers, Inc.*, 29 A.D.3d 615, 617 (2d Dep't 2006))); *Giuliano v. Barch*, No. 16 Civ. 0859 (NSR), 2017 WL 1234042, at *5 (S.D.N.Y. Mar. 31, 2017) ("[I]ndividuals acting on a corporation's behalf are not subject to general personal jurisdiction under Section 301."). There is no allegation in the SAC that any defendant did business in any individual capacity in New York.

Thus, even if the SAC's terse and general language to the effect that defendants had business activities in New York were construed to refer to activities as agents of the Rosetta entities, and if these were construed to connote continuous and systematic such activities—and the SAC says nothing of the sort—the Court would not have a statutory basis under C.P.L.R. § 301 to assert general jurisdiction over them as individuals. *See, e.g., Laufer*, 55 N.Y.2d at 313–14 (declining to exercise general jurisdiction over New York-based president of a nonresident corporation because his contacts with the state were on his employer's behalf); *Giuliano*, 2017 WL 1234042, at *6 (declining to exercise general jurisdiction over foreign individuals who acted in New York State solely on behalf of employer corporation); *Big Apple Pyrotechnics & Multimedia Inc. v. Sparktacular Inc.*, No. 05 Civ. 9994 (KMW), 2007 WL

747807, at *4 (S.D.N.Y. Mar. 9, 2007) (no general jurisdiction over individual defendants whose only activities in New York were "in their capacities as corporate officers").

Personal jurisdiction accordingly cannot be sustained on the basis of a theory of general jurisdiction.

### B.    Specific Jurisdiction

Beskrone next argues that the Court has specific personal jurisdiction over defendants. *See* Dkt. 82 at 4 (citing C.P.L.R. § 302(a)).  For specific jurisdiction to exist under § 302(a), "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor Co.*, 141 S. Ct. at 1025 (cleaned up).  The issue is thus whether defendants' contacts, in connection with their alleged fraudulent and negligent activities, "create[d] a substantial connection with [New York]." *Walden*, 571 U.S. at 284; *see id.* (requiring "suit-related conduct [that] create[s] a substantial connection with the forum state").  Here, Beskrone relies on the various agreements at issue—including the SPAs—as providing a basis for specific personal jurisdiction.  He argues that the claims brought on behalf of the Rosetta estates, and of Sabby, "have a clear 'nexus' to the numerous agreements containing forum selection clauses."  Dkt. 82 at 4 (citing C.P.L.R. § 302(a)).

There are two conceivable scenarios under which such an agreement could give the Court specific personal jurisdiction over defendants.

First, the circumstances surrounding the contracts—their creation or performance—could potentially have conferred such jurisdiction.  Had, for example, the contracts been negotiated in New York, or had the transactions contemplated by the contracts taken place in New York, or had the contracts given rise to obligations that were to be performed in New York, arguments for

specific performance drawing on these circumstances could have been made. The SAC, however, does not allege facts to support such a theory. The SAC's one reference to New York—the conclusory statement that "[t]he Court has personal jurisdiction over Defendants, each of whom transacted business in this District, has significant personal contacts with this District," SAC ¶ 15—is unequal to this task.

Second, and more substantially, is the prospect that the forum selection clauses in the agreements effect waivers by defendants of challenges to personal jurisdiction in this state. That is the principal basis on which Beskrone, in opposing dismissal, defends personal jurisdiction. The forum selection clauses in the agreements are materially identical. Beskrone submits that these provide for personal jurisdiction over defendants here because each is "extremely broad," is "not limited to breach of contract claims between Rosetta [Ltd. and Inc.] and the counterparty," and purports to encompass "the officers and directors of all Rosetta entities, [who] submit irrevocably to the personal jurisdiction of the Southern District of New York, and waive all objections based upon personal jurisdiction and *forum non conveniens*." Dkt. 82 at 1 (cleaned up).

The Court has carefully reviewed the 13 agreements referenced in Beskrone's opposition memorandum. *See* Dkts. 78-1, 78-2, 78-3, 78-4, 78-5, 78-6, 78-7, 78-8, 78-9, 78-10, 78-11, 78-12, 78-13. These were entered into between late 2016 and mid-2018. *See, e.g.*, Dkts. 78-1 (November 23, 2016 contract), 78-13 (April 17, 2018 contract). They cover a variety of transactions and obligations. The agreements include SPAs, *see* Dkts. 78-1, 78-3, 78-4, subsidiary guarantee agreements, *see* Dkts. 78-2, 78-5, a loan and security agreement, *see* Dkt. 78-6, amendments to that agreement, *see* Dkts. 78-11, 78-13, a merger agreement, *see* Dkt. 78-7, amendments to that agreement, *see* Dkt. 78-9, 78-10, 78-12, and a stock purchase agreement, *see*

20

Dkt. 78-8. Each agreement has a distinct counterparty or counterparties. Critically, in none of the contracts is any of the defendants here a party. Each is instead among either (1) the estates represented by Beskrone, or (2) one or more of those estates and a non-party or parties. Each defendant's role in connection with these agreements is on behalf of a Rosetta entity. In other words, although none of these contracts identifies any of the defendants as a party, the SAC alleges that defendants, as executives of one or both of the Rosetta entities, negotiated and entered into these contracts on behalf of that entity, and in some instances, signed the agreement as an authorized signatory for that entity.

The Court uses the August 3, 2017 SPA, Dkt. 78-3, between Rosetta Ltd. and Sabby, as illustrative. For two reasons, this agreement, in the Court's assessment, is the most favorable to Beskrone on this motion. First, of the submitted agreements, its choice of law, choice of forum, and waiver of personal jurisdiction provisions in favor of New York are the broadest (or tied for the broadest), insofar as this waiver runs to all "officers," "agents," and "executives" of the contracting parties.[6] Second, this agreement bears the signature of at least one of the defendants, Berlin.[7] The Court has not identified any basis on which to argue that, if the August 3, 2017 SPA does not confer this Court personal jurisdiction over defendants, any agreement could.[8] Accordingly, the following analysis focuses on the August 3, 2017 SPA.

---

[6] Some contracts, namely those between Genoptix and Rosetta Inc. and Rosetta Ltd., contain far less encompassing language. *See, e.g.*, Dkt. 78-9.

[7] Several contracts, although containing spaces in which each respective party was to sign, have been submitted to the Court in forms lacking signatures. *See, e.g.*, Dkts. 78-1, 78-2.

[8] The Court undertakes this analysis appreciating that "[a] plaintiff must establish the court's jurisdiction with respect to each claim asserted." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). For purposes of personal jurisdiction analysis, the August 3, 2017 SPA is sufficiently representative to permit the determination that, if personal jurisdiction is lacking based on this agreement, it is lacking as to all. Had the Court found this agreement to supply

The pertinent provision of the August 3, 2017 SPA, entitled "Governing Law" (the

"Governing Law Provision"), reads:

> All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any Action or Proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such Action or Proceeding is improper or is an inconvenient venue for such Proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such Action or Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If any party shall commence an Action or Proceeding to enforce any provisions of the Transaction Documents, then, in addition to the obligations of the Company under Section 4.8, the prevailing party in such Action or Proceeding shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Action or Proceeding.

Dkt. 78-3 at 39.

---

personal jurisdiction, the Court would then have turned to the other agreements to determine whether differences (for example, in signatory or text) warranted another result, and, to the extent an agreement did not supply personal jurisdiction over a defendant, whether the doctrine of pendent personal jurisdiction would have applied to defendant(s) as to whom personal jurisdiction had been found based on a different agreement. *See Charles Schwab Corp*, 883 F.3d at 88.

The term "party," used in this provision and elsewhere in the contract, is not defined.  But the agreement defines the SPA as between Rosetta Ltd. and Sabby.  *See id.* at 2, 42.[9]  The Court, accordingly, reads "party" to refer to Rosetta Ltd. and Sabby.  That the term "party" does not include these entities' "respective affiliates, directors, officers, shareholders, partners, members, employees[,] or agents" is a reading that is reinforced by the Governing Law Provision, above, insofar as its second sentence, involving forum selection, treats such personnel as separate from the party itself.

Critically, the ensuing sentence—which effects a waiver of personal jurisdiction—binds only the *parties*.  It reads:

> Each *party* hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any Action or Proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such Action or Proceeding is improper or is an inconvenient venue for such Proceeding.

Dkt. 78-3 (emphasis added).  Thus, unlike in the preceding sentence governing forum selection, this provision does not contain a parenthetical extending its obligations to the persons affiliated with the parties (such as directors, officers, employees, or agents).

Because the agreement's waiver of personal jurisdiction—by its plain text—does not extend to the defendants here, the Court's authority to exercise personal jurisdiction over them turns on whether some other authority or doctrine supplies such a charter.  Beskrone's collection of claims, brought in his differing capacities, present two distinct scenarios.  As to the claims that Beskrone brings on behalf of Sabby, Beskrone seeks to enforce the Governing Law Provision

---

[9] The August 3, 2017 SPA, in the version filed, lacks a signature from any representative of Sabby.  The Court assumes *arguendo* that the agreement was in fact signed.

against a person associated with Sabby's counterparty—to wit, defendants, who were, among other capacities, agents of counterparty Rosetta Ltd. And as to the claims that Beskrone brings on behalf of the Rosetta entities, Beskrone attempts to enforce the Governing Law Provision against Rosetta's own personnel, based on the agreement it entered into with Sabby. In each instance, Rosetta Ltd. and Rosetta Inc., embodied here by Beskrone, seek to effectively bind third parties to its own personal jurisdiction waiver in the agreement with Sabby.[10]

A recent decision in this District—also involving a corporation's bid to enforce such a clause against third-party affiliates of a party that had consented to personal jurisdiction—is persuasive as to these bids. In *Arcadia Biosciences, Inc. v. Vilmorin & Cie et al.* ("*Arcadia*"), 356 F. Supp. 3d 379, 387 (S.D.N.Y. 2019), the defendant, Arista Cereal Technologies Pty Limited ("Arista"), moved to dismiss for lack of personal jurisdiction. The plaintiff, Arcadia Biosciences, Inc. ("Arcadia"), countered that Arista was bound by a forum selection clause in a contract Arcadia had signed with another defendant. *Id.* at 389. That contract purported, by its terms, to bind all "affiliates" of that defendant—a role which Arista indisputably became. *Id.* at 389–90. But Arista challenged personal jurisdiction on the ground that Arista itself was not a party to the contract containing the obligation to litigate in New York, even if that contract had purported to bind affiliates like Arista. *Id.* at 389.

Judge Rakoff held that enforcing the personal-jurisdiction clause against Arista would not comport with either New York law or federal due process. *Id.* at 390. He surveyed a "line of cases" in the Second Circuit—cited by the plaintiff in *Arcadia* and relied upon by Beskrone here,

---

[10] Although Rosetta Inc. is not a party to the August 3, 2017 SPA, it is to other contracts with similar choice of law and forum selection language, such as the Loan and Security Agreement, and the November 23, 2016 Subsidiary Guarantee. *See* Dkt. 78-2. The analysis that follows would apply to the other agreements to which Rosetta Inc. is party.

*see* Dkt. 82 at 2–3—which, applying contract law, "authoriz[ed] the enforcement of forum selection clauses against non-signatories."[11] *Arcadia*, 356 F. Supp. 3d at 393. Such precedents, Judge Rakoff recognized, have justified "the application of forum selection clauses to non-signatories . . . by various policy benefits, including 'the contribution that such clauses have been praised for making to certainty in commercial transactions,' 'the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended,' the promotion of 'vital interests of the justice system, including judicial economy and efficiency,' and the guarantee 'that parties will not be required to defend lawsuits in far-flung fora.'" *Id.* at 395 (quoting *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 722 (2d Cir. 2013)).

However, Judge Rakoff noted, a different question was presented by an attempt to enforce forum selection clauses "against 'closely related' non-signatory defendants . . . where those defendants object to the exercise of personal jurisdiction." *Id.* at 394. Although some courts had done so, Judge Rakoff was "not persuaded to follow suit." *Id.* As he explained, the concept of personal jurisdiction has a constitutional foundation, in that due process requires "that a defendant have 'minimum contacts' with the forum state." *Id.* at 395. And:

> "In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." *Calder v. Jones*, 465 U.S. 783, 788 (1984). "[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum State," not "contacts between the plaintiff (or third parties) and the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

---

[11] As used in this analysis, the term "signatory" does not refer to persons who physically signed the agreement in a representative capacity, but to the parties to those agreements. *See* Dkt. 82-2 (Beskrone, identifying "Rosetta Ltd[.] and Rosetta, Inc., as the signatories to the contracts," and arguing that defendants, as officers and directors who were "'involved' in the agreements and transactions" and "caused the companies to enter and executed each agreement, are bound by them").

*Id.* at 394. Judge Rakoff therefore distinguished the question of personal jurisdiction, "driven by constitutional concerns," *id.*, from the questions of *forum non conveniens* and venue, which "are driven primarily by concerns for the 'convenience of litigants and witnesses,'" *id.* (quoting *Denver & R. G. W. R. Co. v. Bhd. of R.R. Trainmen*, 387 U.S. 556, 560 (1967)). And because there was no connection between Arista—an Australia joint venture formed by foreign entities—and New York, a non-party's agreement consenting to New York jurisdiction for its affiliates was insufficient as a basis for the Court to exercise personal jurisdiction. *See id.* at 395.

Judge Rakoff's analysis is persuasive here. As in *Arcadia*, Beskrone "has shown no connection between [defendants] and New York." *Id.* None of the defendants here is a resident or citizen of New York. None is alleged to have done business or retained a residence, other property, or even bank accounts in New York. And thus, as in *Arcadia*, the Court holds that enforcing the personal-jurisdiction clause against defendants would not comport with either New York law or federal due process.

Another decision in this District, decided after *Arcadia* and relying on its analysis, reaches the same conclusion on a fact pattern that mirrors even closer that here. In *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.* ("*HSM Holdings*"), No. 20 Civ. 967 (LJL), 2021 WL 918556 (S.D.N.Y. Mar. 10, 2021), Judge Liman held that a forum selection clause could not be enforced against executives who signed contracts in a representative capacity and who, in the litigation at hand, disputed personal jurisdiction. In *HSM Holdings*, Judge Liman found "no reflection in the body of the [contract] that the [defendants] signed in anything other than a corporate capacity and no allegation in the Complaint that they were asked to or did sign in their individual capacities." *Id.* at *9. In *HSM Holdings*, that conclusion was reinforced by the fact that the *parties* to the agreement were not the defendants, but, rather, their corporate employers.

*See id.* ("The parties to the Agreement were [the corporations], not [the individual defendants].").[12] Precisely the same is so here, and Judge Liman's persuasive analysis therefore controls.

Nor, on the facts alleged, could Beskrone argue that defendants were "alter egos" of the Rosetta entities. "In determining whether an entity is properly understood as another's alter-ego for jurisdictional purposes, courts consider whether there was a failure to observe corporate formalities, evidence of undercapitalization, intermingling of personal and corporate funds, shared office space and phone numbers, any overlap in ownership and directors and whether the corporation was used to perpetrate a wrongful act against the plaintiffs." *Id.* at *10 (quotation omitted). The SAC does not provide any factual allegations along these lines, and Beskrone does not proffer any in defending his claim of personal jurisdiction. He does not, for example, allege that defendants disregarded corporate formalities in performing their duties as executives of the Rosetta entities, that they comingled finances with Rosetta, or that Rosetta's business affairs were so intertwined with defendants' individual actions as to merit treating them "as one entity." *Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 142–43 (2d Cir. 1991).

In sum, with Beskrone not having identified any connection between defendants and New York other than provisions in contracts to which defendants are not parties, compelling them to

---

[12] As Judge Liman noted, this conclusion accords with case law as to when a corporate representative can be personally bound by a contract. *See HSM Holdings*, 2021 WL 918556, at *9 (collecting cases). These reflect the "well-established" proposition "that an 'agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" *Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 467 F. App'x 4, 17 (2d Cir. 2012) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 114 (1953)).

defend this suit in this forum rests on "too thin a reed" to sustain the exercise of personal jurisdiction. *Arcadia*, 356 F. Supp. 3d at 395. The Court, finding no basis on which to exercise general or specific personal jurisdiction over defendants, therefore grants their motion to dismiss for lack of personal jurisdiction. This ruling is, of course, without prejudice to Beskrone's right to pursue his claims against defendants in a forum consistent with the exercise of personal jurisdiction. In light of this ruling, the Court has no occasion to reach defendants' other arguments, including under Rule 12(b)(6).

## CONCLUSION

For the reasons above, the Court dismisses all claims in the SAC for want of personal jurisdiction. This ruling is without prejudice to these claims being pursued in another forum.

The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: February 15, 2023
New York, New York